## KILBOURN *v.* THOMPSON.

1. K., for refusing to answer certain questions put to him as a witness by the House of Representatives of the Congress of the United States, concerning the business of a real-estate partnership of which he was a member, and to produce certain books and papers in relation thereto, was, by an order of the House, imprisoned for forty-five days in the common jail of the District of Columbia. He brought suit to recover damages therefor against the sergeant-at-arms, who executed the order, and the members of the committee, who caused him to be brought before the House, where he was adjudged to be in contempt of its authority. *Held,* that, although the House can punish its own members for disorderly conduct, or for failure to attend its sessions, and can decide cases of contested elections and determine the qualifications of its members, and exercise the sole power of impeachment of officers of the government, and may, where the examination of witnesses is necessary to the performance of these duties, fine or imprison a contumacious witness, — there is not found in the Constitution of the United States any general power vested in either House to punish for contempt.

2. An examination of the history of the English Parliament and the decisions of the English courts shows that the power of the House of Commons, under the laws and customs of Parliament to punish for contempt, rests upon principles peculiar to it, and not upon any general rule applicable to all legislative bodies.

3. The Parliament of England, before its separation into two bodies, since known as the House of Lords and the House of Commons, was a high court of judicature, — the highest in the realm, — possessed of the general power incident to such a court of punishing for contempt. On its separation, the power remained with each body, because each was considered to be a court of judicature and exercised the functions of such a court.

4. Neither House of Congress was constituted a part of any court of general jurisdiction, nor has it any history to which the exercise of such power can be traced. Its power must be sought alone in some express grant in the Constitution, or be found necessary to carry into effect such powers as are there granted.

5. The court, without affirming that such a power can arise in any case other than those already specified, decides that it can exist in no case where the House, attempting to exercise it, invokes its aid in a matter to which its authority does not extend, such as an inquiry into the private affairs of the citizen.

6. The Constitution divides the powers of the government which it establishes into the three departments — the executive, the legislative, and the judicial — and unlimited power is conferred on no department or officer of the government. It is essential to the successful working of the system that the lines which separate those departments shall be clearly defined and closely followed, and that neither of them shall be permitted to encroach upon the powers exclusively confided to the others.

7. That instrument has marked out, in its three primary articles, the allotment of power to those departments, and no judicial power, except that above mentioned, is conferred on Congress or on either branch of it. On the contrary it declares that the judicial power of the United States shall be vested in one Supreme Court and such inferior courts as the Congress may from time to time ordain and establish.

8. The resolution of the House, under which K. was summoned and examined as a witness, directed its committee to examine into the history and character of what was called "the real-estate pool" of the District of Columbia; and the preamble recited, as the grounds of the investigation, that Jay Cooke & Co., who were debtors of the United States, and whose affairs were then in litigation before a bankruptcy court, had an interest in the pool or were creditors of it. The subject-matter of the investigation was judicial, and *not* legislative. It was then pending before the proper court, and there existed no power in Congress, or in either House thereof, on the allegation that an insolvent debtor of the United States was interested in a private business partnership, to investigate the affairs of that partnership, and consequently no authority to compel a witness to testify on the subject.

9. It follows that the order of the House, declaring K. guilty of a contempt of its authority, and ordering his imprisonment by the sergeant-at-arms, is void, and affords the latter no protection in an action by K. against him for false imprisonment.

10. *Anderson* v. *Dunn* (6 Wheat. 204) commented on, and some of the reasoning of the opinion overruled and rejected.

11. The provision of the Constitution, that, for any speech or debate in either House, the members shall not be questioned in any other place, exempts them from liability elsewhere for any vote, or report to or action in their respective Houses, as well as for oral debate. Therefore the plea of the members of the committee that they took no part in the actual arrest and imprisonment of K., and did nothing in relation thereto beyond the protection of their constitutional privilege, is, so far as they are concerned, a good defence to the action.

ERROR to the Supreme Court of the District of Columbia.

This is an action for false imprisonment brought by Hallett Kilbourn against John G. Thompson, Michael C. Kerr, John M. Glover, Jeptha D. New, Burwell P. Lewis, and A. Herr Smith. The declaration charges that the defendants with force and arms took the plaintiff from his house, and without any reasonable or probable cause, and against his will, confined him in the common jail of the District of Columbia for the period of forty-five days. The defendant Kerr died before process was served upon him.

Thompson pleaded first the general issue, and secondly a special plea, wherein he set forth that the plaintiff ought not to have or maintain his action, because that long before and at the said time when the force and injuries complained of by him are alleged to have been inflicted, and during all the time in the said declaration mentioned, a congress of the United States was holden at the city of Washington, in the District of Columbia, and was then and there, and during all the time aforesaid, assembled and sitting; that long before and at the time when said force and injuries are alleged to have occurred, and during all the time mentioned, he, the said Thompson, was, and yet is, sergeant-at-arms of the House of Representatives, and by virtue of his office, and by the tenor and effect of the standing rules and orders ordained and established by said House for the determining of the rules of its proceedings, and by the force and effect of the laws and customs of said House and of said Congress, was then and there duly authorized and required, amongst other things, to execute the command of said House, from time to time, together with all such process issued by authority thereof as shall be directed to him by its speaker; that long before and at the time aforementioned one Michael C. Kerr was the speaker of said House, and by virtue of his office, and by the tenor, force, and effect of said standing rules, orders, laws, and customs, was, among other things, duly authorized and required to subscribe with his proper hand, and to seal with the seal of said House, all writs, warrants, and subpœnas issued by its order; that long before and during said time one George M. Adams was the clerk of said House, authorized and required to attest and subscribe with his proper hand all writs,

warrants, and subpœnas issued by order of said House; that it was among other things ordained, established, and practised by and under such standing rules, orders, laws, and customs, that all writs, warrants, subpœnas, and other process issued by order of said House shall be under the hand of the speaker and seal of said House, and attested by said clerk; and so being under said hand and seal, and so attested, shall be executed pursuant to the tenor and effect of the same by the sergeant-at-arms; that said Kerr being such speaker, and said Adams such clerk, and the defendant such sergeant-at-arms, and while said Congress was in session, the House of Representatives on the twenty-fourth day of January, 1876, adopted the following preamble and resolution:—

"Whereas the government of the United States is a creditor of the firm of Jay Cooke & Co., now in bankruptcy by order and decree of the District Court of the United States in and for the Eastern District of Pennsylvania, resulting from the improvident deposits made by the Secretary of the Navy of the United States with the London branch of said house of Jay Cooke & Co. of the public moneys; and whereas a matter known as the real-estate pool was only partially inquired into by the late joint select committee to inquire into the affairs of the District of Columbia, in which Jay Cooke & Co. had a large and valuable interest; and whereas Edwin M. Lewis, trustee of the estate and effects of said firm of Jay Cooke & Co., has recently made a settlement of the interest of the estate of Jay Cooke & Co., with the associates of said firm of Jay Cooke & Co., to the disadvantage and loss, as it is alleged, of the numerous creditors of said estate, including the government of the United States; and whereas the courts are now powerless by reason of said settlement to afford adequate redress to said creditors:

"*Resolved*, that a special committee of five members of this House, to be selected by the speaker, be appointed to inquire into the matter and history of said real-estate pool and the character of said settlement, with the amount of property involved in which Jay Cooke & Co. were interested, and the amount paid or to be paid in said settlement, with power to send for persons and papers and report to this House."

That in pursuance and by authority of said resolution said speaker appointed John M. Glover, Jeptha D. New, Burwell

B. Lewis, A. Herr Smith, and Henry O. Pratt, who were mem
bers of the House of Representatives, to constitute said com-
mittee; and the said committee, so appointed, duly organized
in the city of Washington, and proceeded to make the inquiry
directed; that said committee, by the authority in them vested
by said resolution, caused to be issued by the speaker, under
his hand and the seal of the House of Representatives, and
duly attested by the clerk, a subpœna to said Kilbourn, com-
manding him to appear before said committee to testify and be
examined touching and in regard to the matter to be inquired
into by said committee; that said Kilbourn was further com-
manded and ordered by said subpœna to bring with him certain
designated and described records, papers, and maps relating to
said inquiry; that subsequently to the issue of the subpœna
and before the time when the force and injuries complained of
are alleged to have been inflicted, Kilbourn, in obedience to
the subpœna, appeared before the committee and was exam-
ined by it in relation to and in prosecution of said inquiry, and
during his examination said Kilbourn was asked the following
question : " Will you state where each of the five members
reside, and will you please state their names?" which question
was pertinent and material to the question of inquiry before
the committee, but he knowingly and wilfully refused to answer
the same; that he, although ordered and commanded by the
subpœna to bring with him and produce before the said com-
mittee certain records, papers, and maps relating to said in-
quiry, still when asked by the said committee, " Mr. Kilbourn,
are you now prepared to produce, in obedience to the *subpœna
duces tecum,* the records which you have been required by the
committee to produce?" knowingly and wilfully refused to
produce them ; that subsequently to these refusals, and before
the time when the force and injuries complained of are alleged
to have been inflicted, to wit, on the fourteenth day of March,
1876, the committee reported to the House, then sitting, the
facts above stated, to wit, the resolution creating the commit-
tee, the appointment of the members on said committee by the
speaker, the issuing of the *subpœna duces tecum* to said Kil-
bourn, his appearance before the committee, and his refusal to
answer the questions, and his further refusal to produce said

records, papers, and maps, and the committee further reported to said House as follows : " The committee are of opinion and report that it is necessary for the efficient prosecution of the inquiry ordered by the House that the said Hallet Kilbourn should be required to respond to the *subpœna duces tecum* and answer the questions which he has refused to answer; and that there is no sufficient reason why the witness should not obey said *subpœna duces tecum* and answer the questions which he has refused to answer ; and that his refusal as aforesaid is in contempt of this House," as by the journal, record, and proceedings, and report in the said House remaining, reference being thereto had, will more fully appear ; that on March 14, 1876, it was, in and by the said House, for good and sufficient cause to the same appearing, resolved and ordered that the speaker should forthwith issue his warrant, directed to the sergeant-at-arms, commanding him to take into custody the body of the said Kilbourn wherever to be found, and the same to have forthwith before the said House, at the bar thereof, to then and there answer why he should not be punished as guilty of contempt of the dignity and authority of the same, and in the mean time to keep the said Kilbourn in his custody to await the further order of the said House.   Whereupon such speaker, on the fourteenth day of March, 1876, did duly make and issue his certain warrant under his hand and the seal of the House of Representatives, and duly attested, directed to the defendant, as such sergeant-at-arms, reciting that the House of Representatives had that day ordered the speaker to issue his warrant directed to the sergeant-at-arms, commanding him to take into custody the body of the said Kilbourn wherever to be found, and the same forthwith to have before the said House, at the bar thereof, then and there to answer why he should not be punished for contempt, and in the mean time to be kept in his, the said defendant's, custody to await the further order of the House ; therefore it was required in and by said warrant that the defendant, as such sergeant-at-arms as aforesaid, should take into his custody the body of said Kilbourn, and then forthwith to bring him before said House, at the bar thereof, then and there to answer to the charges aforesaid, and to be dealt with by said House according to the Constitution

and laws of the United States, and in the mean time to keep said Kilbourn in his custody to await the further order of said House; and the said Kerr, so being such speaker as aforesaid, then and there delivered said warrant to the defendant as sergeant-at-arms to be executed in due form of law; that by virtue and in execution of said warrant the defendant as such sergeant, in order to arrest said Kilbourn and convey him in custody to the bar of the House to answer to the charge aforesaid, and to be dealt with by said House according to the Constitution and laws of the United States, in obedience to the resolution and order aforesaid, and to the tenor and effect of the said warrant, went to said Kilbourn, and then and there gently laid his hands on him to arrest him, and did then and there arrest him by his body and take him into custody, and did then forthwith convey him to the bar of said House, as it was lawful for the defendant to do for the cause aforesaid; and thereupon such proceedings were had in and by said House, that said Kilbourn was then and there forthwith duly heard in his defence, and was duly examined by said House through its speaker, and was asked in said examination the following question, to wit, "Mr. Kilbourn, are you now prepared to answer, upon the demand of the proper committee of the House, where each of these five members reside?" (meaning the members of the pool), which question was pertinent and material to the question under inquiry; but said Kilbourn did knowingly and wilfully refuse to answer the question so asked; that said House, through its speaker, at the same time and place, asked said Kilbourn the further question, to wit, "Are you (meaning the said Kilbourn) prepared to produce, in obedience to the *subpœna duces tecum,* the records which you have been required by the committee to produce?" (which said records were pertinent and material to the question under inquiry), but he knowingly and wilfully declined and refused to produce them; that thereupon it was then and there resolved by said House as follows: —

"*Resolved,* that Hallet Kilbourn having been heard by the House pursuant to the order heretofore made requiring him to show cause why he should not answer questions propounded to him by a com-

mittee and respond to the *subpœna duces tecum* by obeying the same, and having failed to show sufficient cause why he should not answer said questions and obey said *subpœna duces tecum,* be, and is, therefore considered in contempt of said House because of said failure.

" *Resolved,* that in purging himself of the contempt for which Hallet Kilbourn is now in custody, the said Kilbourn shall be required to state to the House whether he is now willing to appear before the committee of the House to whom he has hitherto declined to obey a certain *subpœna duces tecum,* and to answer certain questions and obey said *subpœna duces tecum,* and answer said questions; and if he answers that he is ready to appear before said committee and obey said *subpœna duces tecum,* and answer said questions, then said witness shall have the privilege to so appear and obey and answer forthwith, or so soon as said committee can be convened, and that in the mean time the witness remain in custody; and in the event that said witness shall answer that he is not ready to so appear before said committee and obey said *subpœna duces tecum,* and make answer to said questions as aforesaid, then that said witness be recommitted to the said custody for the continuance of said contempt, and that such custody shall continue until the said witness shall communicate to this House through said committee that he is ready to appear before said committee and make such answer and obey said *subpœna duces tecum ;* and that in executing this order the sergeant-at-arms shall cause the said Kilbourn to be kept in his custody in the common jail of the District of Columbia;"

as by the journal, record, and proceedings of the said resolutions and orders in the said House remaining, reference being thereto had, will more fully appear.

Whereupon said Kerr, so being such speaker, in pursuance of such standing rules and orders as aforesaid, and according to such laws and customs as aforesaid, and in execution of the order contained in said resolutions, did afterwards, to wit, on the fourteenth day of March, 1876, duly make and issue his certain warrant, directed to the defendant, as sergeant-at-arms, in the following words, to wit: —

" *Forty-fourth Congress, First Session, Congress of the United States.*

" IN THE HOUSE OF REPRESENTATIVES,
" March 4, 1876.

" To JOHN G. THOMPSON, Esq.,
" *Sergeant-at-Arms of the House of Representatives:*

" SIR, — The following resolution has this day been adopted by the House of Representatives:

" ' *Resolved,* that in purging himself of the contempt for which Hallet Kilbourn is now in custody, the said Kilbourn shall be required to state to the House whether he is now willing to appear before a committee of this House, to whom he has hitherto declined to obey a certain *subpœna duces tecum* and answer certain questions, and obey said *subpœna duces tecum* and make answer to said questions, and if he answers that he is ready to appear before said committee and obey said *subpœna duces tecum* and answer said questions, then said witness shall have the privilege to so appear and obey and answer forthwith, or so soon as the committee can be convened, and that in the mean time the witness shall remain in custody; and in the event that said witness shall answer that he is not ready to so appear before said committee and obey said *subpœna duces tecum* and make answer to said questions as aforesaid, then that said witness be recommitted to the said custody for the continuance of such contempt, and that such custody shall continue until the said witness shall communicate to this House, through said committee, that he is ready to appear before said committee and make such answer and obey said *subpœna duces tecum ;* and that in executing this order the sergeant-at-arms shall cause the said Kilbourn to be kept in his custody in the common jail of the District of Columbia.'

" Now, therefore, you are hereby commanded to execute the same accordingly.

" In witness whereof I have hereunto set my hand and caused the seal of the House of Representatives to be affixed the day and year above written.

[SEAL.]　　　　　　　　　　　　" M. C. KERR, *Speaker*
" Attest:

" GEORGE M. ADAMS, *Clerk.*"

That by virtue and in execution of said warrant, according to its tenor and effect, the defendant, as such sergeant-at-arms

in order to arrest the said Kilbourn and convey him in custody to the common jail of the District of Columbia, in obedience to the resolutions and orders aforesaid, went to him and then and there gently laid his hands on him to arrest him, and did then and there arrest him by his body and take him into custody, and forthwith convey him to the common jail of the District of Columbia, and did keep him in custody therein until the eighteenth day of April, 1876, when and on which day, in response to a writ of *habeas corpus* issued by order of the Chief Justice of the Supreme Court of the District of Columbia, and directed to the defendant as sergeant-at-arms, requiring him to produce the body of Kilbourn before the said Chief Justice at the court-house in the city of Washington, in the District of Columbia; and by direction and order of the said House of Representatives the defendant, as sergeant-at-arms, conveyed the said Kilbourn in custody from the common jail of said District to said court-house, and then and there delivered him into the custody of the marshal for the District of Columbia, nor has he had said Kilbourn in his custody since said delivery to said marshal.

Which are the me several supposed trespasses complained of, and no other.

The other defendants pleaded jointly the general issue, and a plea of justification similar to that of the defendant Thompson, except that they alleged themselves to have been members of the House of Representatives, and of a committee of that House, and that what they did was in that capacity, and was warranted by the circumstances.

They also added the following: —

"And these defendants state, that they did not in any manner assist in the last-mentioned arrest and imprisonment of the said Kilbourn, nor were they in any way concerned in the same, nor did they order or direct the same, save and except by their votes in favor of the last above-mentioned resolutions and order commanding the speaker to issue his warrant for said arrest and imprisonment, and (save and except) by their participation as members in the introduction of and assent to said official acts and proceedings of said House, which these defendants did and performed as members of the said House of Represent-

atives in the due discharge of their duties as members of said House, and not otherwise.

" Which are the same several supposed trespasses whereof the said Kilbourn hath above in his said declaration complained against these defendants, and not other or different, with this, that these defendants do aver that the said Kilbourn, the now plaintiff, and the said Kilbourn in the said resolutions, orders, and warrants respectively mentioned, was and is one and the same person, and that at the said several times in this plea mentioned, and during all the time therein mentioned, the said Congress of the United States was assembled, and sitting, to wit, at Washington aforesaid, in the county aforesaid, and these defendants were and are members of the House of Representatives, one of the Houses of said Congress, and as such members, in said participation in the action of the House as above set forth, voted in favor of said resolutions and orders as above set forth, and saving and excepting said participation in the action of the House as set forth in the body of this plea, they had no concern or connection in any manner or way with said supposed trespasses complained of against them by the plaintiff ; and this these defendants are ready to verify."

The plaintiff demurred to the special pleas of the defendants. The demurrer having been overruled and judgment rendered for the defendants, the plaintiff sued out this writ of error.

*Mr. Charles A. Eldredge, Mr. Enoch Totten,* and *Mr. Noah L. Jeffries,* for the plaintiff in error.

The power to punish a citizen for contempt is not in express terms or by implication conferred by the Constitution of the United States upon either House of Congress. Its assumption is in direct contravention of the Fourth and Fifth Amendments. *Ex parte Lange,* 18 Wall. 163 ; *Ex parte Milligan,* 4 id. 2 ; *United States* v. *Cruikshank,* 92 U. S. 542 ; *Loan Association* v. *Topeka,* 20 Wall. 655 ; Potter's Dwarris, 430 ; *Wilkinson* v. *Leland,* 2 Pet. 627 ; *Calder* v. *Bull,* 3 Dall. 386. It derives no support from the *lex parliamenti* of England, which was entirely distinct and separate from the jurisdiction of Westminster Hall. *King* v. *Flower,* 8 T. R. 314 ; *Brass*

*Crosby's Case,* 3 Wils. 188; *Regina* v. *Paty,* 2 Ld. Raym. 1105; *Burdett* v. *Abbott,* 14 East, 1; *Pennock* v. *Dialogue,* 2 Pet. 1; *Kirkpatrick* v. *Gibson,* 2 Brock. 388; *Floyde's Case,* 2 How. St. Tr. 1153; *Murray's Case,* 1 Wils. 299; *Bell's Case,* 59 Lords' Jour. 199, 206.

In England the power to punish for contempt is held not to be inherent in legislative assemblies or necessary to the proper discharge of their duties. *Kielley* v. *Carson,* 4 Moo. P. C. 63; *Fenton* v. *Hampton,* 11 id. 347; *Doyle* v. *Falconer,* Law Rep. 1 P. C. 328; *Stockdale* v. *Hansard,* 9 Ad. & E. 1.

In the first of these cases, the reasoning in *Dunn* v. *Anderson* (6 Wheat. 204), and the assertions of Mr. Justice Story in his Commentaries on the Constitution of the United States, are referred to with disapprobation. Conceding even that the House of Representatives may lawfully investigate the private affairs of a citizen, the proceeding by which the plaintiff was deprived of his liberty was illegal, and the warrant of the speaker void. Congress, by the act of Jan. 24, 1857, c. 19 (11 Stat. 155), as modified by sects. 102 and 104 of the Revised Statutes, prescribed a means for punishing a person who, having by the authority of either House of Congress been summoned as a witness to give testimony or produce papers upon any matter under inquiry before it, or one of its committees, wilfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry. It is the duty of the presiding officer of that House to certify the fact of such refusal to the "district attorney for the District of Columbia," whose duty it shall be to bring the matter before the grand jury. No other than the prescribed punishment can be inflicted. *Haney* v. *State,* 5 Wis. 529; *Scringrour* v. *State,* 1 Chand. (Wis.) 48. This is true in matters of contempt. *Bickley* v. *Commonwealth,* 2 J. J. Marsh. (Ky.) 572; *Ex parte Edwards,* 11 Fla. 174; *Dunham* v. *State,* 6 Iowa, 245; *People* v. *Liscomb,* 60 N. Y. 559. Double penalties cannot be inflicted. *Driskill* v. *Parrish,* 3 McLean, 631; *City of Brooklyn* v. *Toynbee,* 31 Barb. (N. Y.) 282; *Sipperly* v. *Railroad Company,* 9 How. (N. Y.) Pr. 83; *Washburn* v. *McInroy,* 7 Johns. (N. Y.) 134; *Tiffany* v. *Driggs,* 13 id. 252.

Because, as a punishment, the law has denounced a loss of

two of the rights of citizenship, it does not follow that a third right is to be withheld from the delinquent. Indeed, the reverse result is the reasonable deduction, because it is clear on common principles that no penalty for crime can be inflicted except that which is expressly prescribed. The fact that several penal consequences are annexed by statute to the commission of a breach of law cannot warrant the aggravation, by the judicial hand, of the punishment prescribed. *The State* v. *Pritchard,* 12 Am. Law Reg. N. S. 518, *Ex parte Lange,* 18 Wall. 163; *Rex* v. *Wright,* 1 Burr. 543, *State* v. *Bishop,* 7 Conn. 181; *Respublica* v. *De Longchamps,* 1 Dall. 111; *Emery's Case,* 107 Mass. 172; *State* v. *Egglesht,* 41 Iowa, 574.

*Mr. Walter H. Smith* and *Mr. Frank H. Hurd, contra.*

The House of Representatives has power to arrest and commit persons guilty of a contempt of its authority. *Anderson* v. *Dunn,* 6 Wheat. 204; *Wickelhausen* v. *Willett,* 10 Abb. (N. Y.) Pr. 164; *Yates* v. *Lansing,* 9 Johns. (N. Y.) 395; *Hiss* v. *Bartlett,* 3 Gray (Mass.), 468; *Johnston* v. *Commonwealth,* 1 Bibb (Ky.), 598; 1 Kent, Com. 236; Story, Const., sects. 845, 849; Rawle, Const. 254; Sergeant, Const. Law, 534.

The same doctrine is held by the English courts as applicable to the House of Commons. *Burdett* v. *Abbott,* 14 East, 1; *Beaumont* v. *Barrett,* 1 Moo. P. C. 59; *Howard* v. *Gossett,* 10 Ad. & E. N. S. 359.

The decision of the House as to the fact of contempt is conclusive, and cannot be collaterally impeached. *Anderson* v. *Dunn, supra; Howard* v. *Gossett, supra; Burdett* v. *Abbott, supra; Ex parte Kearney,* 7 Wheat. 38; *Stockdale* v. *Hansard,* 9 Ad. & E. 1; *Case of the Sheriff of Middlesex,* 11 id. 273.

With the exception of Thompson, the defendants took no part in the proceedings against the plaintiff other than by making their report to the House and there voting, as members, in support of the resolutions. For what they there did they are protected against being "questioned in any other place."

Thompson acted under the warrant of the speaker. As an officer of the House, he was charged with the duty of executing its commands, and the law affords him complete protection.

*Erskine* v. *Hornbach*, 14 Wall. 613; *Savacool* v. *Boughton*, 5 Wend. (N. Y.) 170; *Earl* v. *Camp*, 16 id. 562; *Chegaray* v. *Jenkins*, 5 N. Y. 376; *Sprague* v. *Birchard*, 1 Wis. 457.

The authorities cited by the plaintiff in error do not sustain his position that the Revised Statutes having made provision for the punishment of a recusant witness, he cannot be otherwise punished.

The uniform current of authority is the other way. *Rex* v. *Ossulston*, 2 Stra. 1107; *King* v. *Piersor*, Andr. 310; *State* v. *Yancy*, Law Repos. (N. C.) 519; *State* v. *Woodfin*, 5 Ired. (N. C.) L. 199; *State* v. *Williams*, 2 Spears (S. C.), 26; *Ex parte Brounsall*, 2 Cowp. 829; *Vertner* v. *Martin*, 18 Miss. 103; *Foster* v. *Commonwealth*, 8 Watts & S. (Pa.) 77; *In re King*, 8 Q. B. 129; *In re Wright*, 1 Exch. 658; *Regina* v. *Martin*, 5 Cox, C. C. 356; *People* v. *Stevens*, 13 Wend. (N. Y.) 341; *Levy* v. *The State*, 6 Ind. 281; *Ambrose* v. *State*, id. 351; *Phillips* v. *People*, 55 Ill. 429; *Moore* v. *People*, 14 How. 13; 2 Bishop, Cr. Law, sect. 264.

MR. JUSTICE MILLER, after stating the case, delivered the opinion of the court.

The argument before us has assumed a very wide range, and includes the discussion of almost every suggestion that can well be conceived on the subject. The two extremes of the controversy are, the proposition on the part of the plaintiff, that the House of Representatives has no power whatever to punish for a contempt of its authority; and on the part of defendants, that such power undoubtedly exists, and when that body has formally exercised it, it must be presumed that it was rightfully exercised.

This latter proposition assumes the form of expression sometimes used with reference to courts of justice of general jurisdiction, that having the power to punish for contempts, the judgment of the House that a person is guilty of such contempt is conclusive everywhere.

Conceding for the sake of the argument that there are cases in which one of the two bodies, that constitute the Congress of the United States, may punish for contempt of its authority, or disregard of its orders, it will scarcely be contended by the

most ardent advocate of their power in that respect that it is unlimited.

The powers of Congress itself, when acting through the concurrence of both branches, are dependent solely on the Constitution. Such as are not conferred by that instrument, either expressly or by fair implication from what is granted, are " reserved to the States respectively, or to the people." Of course, neither branch of Congress, when acting separately, can lawfully exercise more power than is conferred by the Constitution on the whole body, except in the few instances where authority is conferred on either House separately, as in the case of impeachments. No general power of inflicting punishment by the Congress of the United States is found in that instrument. It contains in the provision that no " person shall be deprived of life, liberty, or property, without due process of law," the strongest implication against punishment by order of the legislative body. It has been repeatedly decided by this court, and by others of the highest authority, that this means a trial in which the rights of the party shall be decided by a tribunal appointed by law, which tribunal is to be governed by rules of law previously established. An act of Congress which proposed to adjudge a man guilty of a crime and inflict the punishment, would be conceded by all thinking men to be unauthorized by anything in the Constitution. That instrument, however, is not wholly silent as to the authority of the separate branches of Congress to inflict punishment. It authorizes each House to punish its own members. By the second clause of the fifth section of the first article, " Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member," and by the clause immediately preceding, it " may be authorized to compel the attendance of absent members, in such manner and under such penalties as each House may provide." These provisions are equally instructive in what they authorize and in what they do not authorize. There is no express power in that instrument conferred on either House of Congress to punish for contempts.

The advocates of this power have, therefore, resorted to an

implication of its existence, founded on two principal arguments. These are, 1, its exercise by the House of Commons of England, from which country we, it is said, have derived our system of parliamentary law; and, 2d, the necessity of such a power to enable the two Houses of Congress to perform the duties and exercise the powers which the Constitution has conferred on them.

That the power to punish for contempt has been exercised by the House of Commons in numerous instances is well known to the general student of history, and is authenticated by the rolls of the Parliament. And there is no question but that this has been upheld by the courts of Westminster Hall. Among the most notable of these latter cases are the judgments of the Court of King's Bench, in *Brass Crosby's Case* (3 Wils. 188), decided in the year 1771; *Burdett* v. *Abbott* (14 East, 1), in 1811, in which the opinion was delivered by Lord Ellenborough; and *Case of the Sheriff of Middlesex* (11 Ad. & E. 273), in 1840. Opinion by Lord Denman, Chief Justice.

It is important, however, to understand on what principle this power in the House of Commons rests, that we may see whether it is applicable to the two Houses of Congress, and, if it be, whether there are limitations to its exercise.

While there is, in the adjudged cases in the English courts, little agreement of opinion as to the extent of this power, and the liability of its exercise to be inquired into by the courts, there is no difference of opinion as to its origin. This goes back to the period when the bishops. the lords, and the knights and burgesses met in one body, and were, when so assembled, called the High Court of Parliament.

They were not only called so, but the assembled Parliament exercised the highest functions of a court of judicature, representing in that respect the judicial authority of the king in his Court of Parliament. While this body enacted laws, it also rendered judgments in matters of private right, which, when approved by the king, were recognized as valid. Upon the separation of the Lords and Commons into two separate bodies, holding their sessions in different chambers, and hence called the House of Lords and the House of Commons, the judicial

function of reviewing by appeal the decisions of the courts of Westminster Hall passed to the House of Lords, where it has been exercised without dispute ever since. To the Commons was left the power of impeachment, and, perhaps, others of a judicial character, and jointly they exercised, until a very recent period, the power of passing bills of attainder for treason and other high crimes which are in their nature punishment for crime declared judicially by the High Court of Parliament of the Kingdom of England.

It is upon this idea that the two Houses of Parliament were each courts of judicature originally, which, though divested by usage, and by statute, probably, of many of their judicial functions, have yet retained so much of that power as enables them, like any other court, to punish for a contempt of these privileges and authority that the power rests.

In the case of *Burdett* v. *Abbott*, already referred to as sustaining this power in the Commons, Mr. Justice Bailey said, in support of the judgment of the Court of King's Bench : " In an early authority upon that subject, in Lord Coke, 4 Inst. 23, it is expressly laid down that the House of Commons has not only a legislative character and authority, but is also a court of judicature ; and there are instances put there in which the power of committing to prison for contempts has been exercised by the House of Commons, and this, too, in cases of libel. If then, the House be a court of judicature, it must, as is in a degree admitted by the plaintiff's counsel, have the power of supporting its own dignity as essential to itself ; and without power of commitment for contempts it could not support its dignity." In the opinion of Lord Ellenborough in the same case, after stating that the separation of the two Houses of Parliament seems to have taken place as early as the 49 Henry III., about the time of the battle of Evesham, he says the separation was probably effected by a formal act for that purpose by the king and Parliament. He then adds : " The privileges which have since been enjoyed, and the functions which have been since uniformly exercised by each branch of the legislature, with the knowledge and acquiescence of the other House and of the king, must be presumed to be the privileges and functions which then, that is, at the very period of

their original separation, were statutably assigned to each." He then asks, "Can the High Court of Parliament, or either of the two Houses of which it consists, be deemed not to possess intrinsically that authority of punishing summarily for contempts, which is acknowledged to belong, and is daily exercised as belonging, to every superior court of law, of less dignity undoubtedly than itself?" This power is here distinctly placed on the ground of the judicial character of Parliament, which is compared in that respect with the other courts of superior jurisdiction, and is said to be of a dignity higher than they.

In the earlier case of Crosby, Lord Mayor of London, De Gray, Chief Justice, speaking of the House of Commons, which had committed the lord mayor to the Tower of London for having arrested by judicial process one of its messengers, says : " Such an assembly must certainly have such authority, and it is legal because necessary. Lord Coke says they have a judicial power; each member has a judicial seat in the House; he speaks of matters of judicature of the House of Commons." Mr. Justice Blackstone, in concurring in the judgment, said : " The House of Commons is a Supreme Court, and they are judges of their own privileges and contempts, more especially with respect to their own members." Mr. Justice Gould also laid stress upon the fact that the " House of Commons may be properly called judges," and cites 4 Coke's Inst. 47, to show that "an alien cannot be elected to Parliament, *because such a person can hold no place of judicature.*"

In the celebrated case of *Stockdale* v. *Hansard* (9 Ad. & E. 1), decided in 1839, this doctrine of the omnipotence of the House of Commons in the assertion of its privileges received its first serious check in a court of law. The House of Commons had ordered the printing and publishing of a report of one of its committees, which was done by Hansard, the official printer of the body. This report contained matter on which Stockdale sued Hansard for libel. Hansard pleaded the privilege of the House, under whose orders he acted, and the question on demurrer was, assuming the matter published to be libellous in its character, did the order of the House protect the publication ?

Sir John Campbell, Attorney-General, in an exhaustive argument in defence of the prerogative of the House, bases it upon two principal propositions; namely, that the House of Commons is a court of judicature, possessing the same right to punish for contempt that other courts have, and that its powers and privileges rest upon the *lex parliamenti*,—the laws and customs of Parliament. These, he says, and cites authorities to show it, are unknown to the judges and lawyers of the common-law courts, and rest exclusively in the knowledge and memory of the members of the two Houses. He argues, therefore, that their judgments and orders on matters pertaining to these privileges are conclusive, and cannot be disputed or reviewed by the ordinary courts of judicature.

Lord Denman, in a masterly opinion, concurred in by the other judges of the King's Bench, ridicules the idea of the existence of a body of laws and customs of Parliament unknown and unknowable to anybody else but the members of the two Houses, and holds with an incontrovertible logic that when the rights of the citizen are at stake in a court of justice, it must, if these privileges are set up to his prejudice, examine for itself into the nature and character of those laws, and decide upon their extent and effect upon the rights of the parties before the court. While admitting, as he does in *Case of the Sheriff of Middlesex* (11 Ad. & E. 273), that when a person is committed by the House of Commons for a contempt in regard to a matter of which that House had jurisdiction, no other court can relieve the party from the punishment which it may lawfully inflict, he holds that the question of the jurisdiction of the House is always open to the inquiry of the courts in a case where that question is properly presented.

But perhaps the most satisfactory discussion of this subject, as applicable to the proposition that the two Houses of Congress are invested with the same power of punishing for contempt, and with the same peculiar privileges, and the same power of enforcing them, which belonged by ancient usage to the Houses of the English Parliament, is to be found in some recent decisions of the Privy Council. That body is by its constitution vested with authority to hear and decide appeals from the courts of the provinces and colonies of the kingdom.

The leading case is that of *Kielley* v. *Carson and Others* (4 Moo. P. C. 63), decided in 1841. There were present at the hearing Lord Chancellor Lyndhurst, Lord Brougham, Lord Denman, Lord Abinger, Lord Cottenham, Lord Campbell, Vice-Chancellor Shadwell, the Chief Justice of the Common Pleas, Mr. Justice Erskine, Dr. Lushington, and Mr. Baron Parke, who delivered the opinion, which seems to have received the concurrence of all the eminent judges named.

Measuring the weight of its authority by the reputation of the judges who sat in the case and agreed to the opinion, it would be difficult to find one more entitled on that score to be received as conclusive on the points which it decided.

The case was an appeal from the Supreme Court of Judicature of Newfoundland. John Kent, one of the members of the House of Assembly of that island, reported to that body that Kielley, the appellant, had been guilty of a contempt of the privileges of the House in using towards him reproaches, in gross and threatening language, for observations made by Kent in the House; adding, " Your privilege shall not protect you." Kielley was brought before the House, and added to his offence by boisterous and violent language, and was finally committed to jail under an order of the House and the warrant of the speaker. The appellant sued Carson, the speaker, Kent, and other members, and Walsh, the messenger, who pleaded the facts above stated, and relied on the authority of the House as sufficient protection. The judgment of the court of Newfoundland was for the defendants, holding the plea good.

This judgment was supported in argument before the Privy Council on the ground that the Legislative Assembly of Newfoundland had the same parliamentary rights and privileges which belonged by usage to the Parliament of England, and that, if this were not so, it was a necessary incident to every body exercising legislative functions to punish for contempt of its authority. The case was twice argued in the Privy Council, on which its previous judgment in the case of *Beaumont* v. *Barrett* (1 Moo. P. C. 59) was much urged, in which both those propositions had been asserted in the opinion of Mr. Baron Parke. Referring to that case as an authority for the proposition that the power to punish for a contempt was inci-

dent to every legislative body, the opinion of Mr. Baron Parke in the later case uses this language : " There is no decision of a court of justice, nor other authority, in favor of the right, except that of the case of *Beaumont* v. *Barrett*, decided by the Judicial Committee, the members present being Lord Brougham, Mr. Justice Bosanquet, Mr. Justice Erskine, and myself.  Their Lordships do not consider that case as one by which they ought to be bound on deciding the present question.  The opinion of their Lordships, delivered by myself immediately after the argument was closed, though it clearly expressed that the power was incidental to every legislative assembly, was not the only ground on which that judgment was rested, and therefore was, in some degree, extra-judicial ; but besides, it was stated to be and was founded entirely on the *dictum* of Lord Ellenborough in *Burdett* v. *Abbott*, which *dictum*, we all think, cannot be taken as authority for the abstract proposition that every legislative body has the power of committing for contempt.  The observation was made by his Lordship with reference to the peculiar powers of Parliament, and ought not, we all think, to be extended any further.  We all, therefore, think that the opinion expressed by myself in the case of *Beaumont* v. *Barrett* ought not to affect our decision in the present case, and, there being no other authority on the subject, we decide according to the principle of the common law, that the House of Assembly have not the power contended for.  They are a local legislature, with every power reasonably necessary for the exercise of their functions and duties, but they have not what they erroneously supposed themselves to possess, — the same exclusive privileges which the ancient law of England has annexed to the House of Parliament."  In another part of the opinion the subject is thus disposed of: " It is said, however, that this power belongs to the House of Commons in England ; and this, it is contended, affords an authority for holding that it belongs, as a legal incident by the common law, to an assembly with analogous functions.  But the reason why the House of Commons has this power is not because it is a representative body with legislative functions, but by virtue of ancient usage and prescription ; the *lex et consuetudo parliamenti,* which forms a part of the common law of the land, and according to which

the High Court of Parliament before its division, and the Houses of Lords and Commons since, are invested with many privileges, that of punishment for contempt being one." The opinion also discusses at length the necessity of this power in a legislative body for its protection, and to enable it to discharge its law-making functions, and decides against the proposition. But the case before us does not require us to go so far, as we have cited it to show that the powers and privileges of the House of Commons of England, on the subject of punishment for contempts, rest on principles which have no application to other legislative bodies, and certainly can have none to the House of Representatives of the United States, — a body which is in no sense a court, which exercises no functions derived from its once having been a part of the highest court of the realm, and whose functions, so far as they partake in any degree of that character, are limited to punishing its own members and determining their election. The case, however, which we have just been considering, was followed in the same body by *Fenton* v. *Hampton* (11 Moo. P. C. 347) and *Doyle* v. *Falconer* (Law Rep. 1 P. C. 328), in both of which, on appeals from other provinces of the kingdom, the doctrine of the case of *Kielley* v. *Carson and Others* is fully reaffirmed.

We are of opinion that the right of the House of Representatives to punish the citizen for a contempt of its authority or a breach of its privileges can derive no support from the precedents and practices of the two Houses of the English Parliament, nor from the adjudged cases in which the English courts have upheld these practices. Nor, taking what has fallen from the English judges, and especially the later cases on which we have just commented, is much aid given to the doctrine, that this power exists as one necessary to enable either House of Congress to exercise successfully their function of legislation.

This latter proposition is one which we do not propose to decide in the present case, because we are able to decide it without passing upon the existence or non-existence of such a power in aid of the legislative function.

As we have already said, the Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment

may in a proper case be imprisonment, and that it may be for refusal to obey some rule on that subject made by the House for the preservation of order.

So, also, the penalty which each House is authorized to inflict in order to compel the attendance of absent members may be imprisonment, and this may be for a violation of some order or standing rule on that subject.

Each House is by the Constitution made the judge of the election and qualification of its members. In deciding on these it has an undoubted right to examine witnesses and inspect papers, subject to the usual rights of witnesses in such cases; and it may be that a witness would be subject to like punishment at the hands of the body engaged in trying a contested election, for refusing to testify, that he would if the case were pending before a court of judicature.

The House of Representatives has the sole right to impeach officers of the government, and the Senate to try them. Where the question of such impeachment is before either body acting in its appropriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases.

Whether the power of punishment in either House by fine or imprisonment goes beyond this or not, we are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possesses the general power of making inquiry into the private affairs of the citizen.

It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these depart-

ments shall be broadly and clearly defined. It is also essential
to the successful working of this system that the persons in-
trusted with power in any one of these branches shall not be
permitted to encroach upon the powers confided to the others,
but that each shall by the law of its creation be limited to the
exercise of the powers appropriate to its own department and
no other. To these general propositions there are in the Con-
stitution of the United States some important exceptions. One
of these is, that the President is so far made a part of the
legislative power, that his assent is required to the enactment
of all statutes and resolutions of Congress.

This, however, is so only to a limited extent, for a bill may
become a law notwithstanding the refusal of the President to
approve it, by a vote of two-thirds of each House of Con-
gress.

So, also, the Senate is made a partaker in the functions of
appointing officers and making treaties, which are supposed to
be properly executive, by requiring its consent to the appoint-
ment of such officers and the ratification of treaties. The
Senate also exercises the judicial power of trying impeach-
ments, and the House of preferring articles of impeachment.

In the main, however, that instrument, the model on which
are constructed the fundamental laws of the States, has blocked
out with singular precision, and in bold lines, in its three pri
mary articles, the allotment of power to the executive, the
legislative, and the judicial departments of the government.
It also remains true, as a general rule, that the powers con-
fided by the Constitution to one of these departments cannot
be exercised by another.

It may be said that these are truisms which need no repeti-
tion here to give them force. But while the experience of
almost a century has in general shown a wise and commend-
able forbearance in each of these branches from encroachments
upon the others, it is not to be denied that such attempts have
been made, and it is believed not always without success. The
increase in the number of States, in their population and
wealth, and in the amount of power, if not in its nature to be
exercised by the Federal government, presents powerful and
growing temptations to those to whom that exercise is in-

trusted, to overstep the just boundaries of their own department, and enter upon the domain of one of the others, or to assume powers not intrusted to either of them.

The House of Representatives having the exclusive right to originate all bills for raising revenue, whether by taxation or otherwise; having with the Senate the right to declare war and fix the compensation of all officers and servants of the government, and vote the supplies which must pay that com pensation; and being also the most numerous body of all those engaged in the exercise of the primary powers of the govern ment,—is for these reasons least of all liable to encroachments upon its appropriate domain.

By reason, also, of its popular origin, and the frequency with which the short term of office of its members requires the renewal of their authority at the hands of the people,—the great source of all power in this country,—encroachments by that body on the domain of co-ordinate branches of the government would be received with less distrust than a similar exercise of unwarranted power by any other department of the government. It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositaries of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.

In looking to the preamble and resolution under which the committee acted, before which Kilbourn refused to testify, we are of opinion that the House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial.

The Constitution declares that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. If what we have said of the division of the powers of the government among the three departments be sound, this is equivalent to a declaration that no judicial power is vested in the Congress or either branch of it, save in the cases

specifically enumerated to which we have referred. If the investigation which the committee was directed to make was judicial in its character, and could only be properly and successfully made by a court of justice, and if it related to a matter wherein relief or redress could be had only by a judicial proceeding, we do not, after what has been said, deem it necessary to discuss the proposition that the power attempted to be exercised was one confided by the Constitution to the judicial and not to the legislative department of the government. We think it equally clear that the power asserted is judicial and not legislative.

The preamble to the resolution recites that the government of the United States is a creditor of Jay Cooke & Co., then in bankruptcy in the District Court of the United States for the Eastern District of Pennsylvania.

If the United States is a creditor of any citizen, or of any one else on whom process can be served, the usual, the only legal mode of enforcing payment of the debt is by a resort to a court of justice. For this purpose, among others, Congress has created courts of the United States, and officers have been appointed to prosecute the pleas of the government in these courts.

The District Court for the Eastern District of Pennsylvania is one of them, and, according to the recital of the preamble, had taken jurisdiction of the subject-matter of Jay Cooke & Co.'s indebtedness to the United States, and had the whole subject before it for action at the time the proceeding in Congress was initiated. That this indebtedness resulted, as the preamble states, from the improvidence of a secretary of the navy does not change the nature of the suit in the court nor vary the remedies by which the debt is to be recovered. If, indeed, any purpose had been avowed to impeach the secretary, the whole aspect of the case would have been changed. But no such purpose is disclosed. None can be inferred from the preamble, and the characterization of the conduct of the secretary by the term "improvident," and the absence of any words implying suspicion of criminality repel the idea of such purpose, for the secretary could only be impeached for "high crimes and misdemeanors."

The preamble then refers to "the real-estate pool," in which it is said Jay Cooke & Co. had a large interest, as something well known and understood, and which had been the subject of a partial investigation by the previous Congress, and alleges that the trustee in bankruptcy of Jay Cooke & Co. had made a settlement of the interest of Jay Cooke & Co. with the associates of the firm of Jay Cooke & Co., to the disadvantage and loss of their numerous creditors, including the government of the United States, by reason of which the courts are powerless to afford adequate redress to said creditors.

Several very pertinent inquiries suggest themselves as arising out of this short preamble.

How could the House of Representatives know, until it had been fairly tried, that the courts were powerless to redress the creditors of Jay Cooke & Co.? The matter was still pending in a court, and what right had the Congress of the United States to interfere with a suit pending in a court of competent jurisdiction? Again, what inadequacy of power existed in the court, or, as the preamble assumes, in all courts, to give redress which could lawfully be supplied by an investigation by a committee of one House of Congress, or by any act or resolution of Congress on the subject? The case being one of a judicial nature, for which the power of the courts usually afford the only remedy, it may well be supposed that those powers were more appropriate and more efficient in aid of such relief than the powers which belong to a body whose function is exclusively legislative. If the settlement to which the preamble refers as the principal reason why the courts are rendered powerless was obtained by fraud, or was without authority, or for any conceivable reason could be set aside or avoided, it should be done by some appropriate proceeding in the court which had the whole matter before it, and which had all the power in that case proper to be intrusted to any body, and not by Congress or by any power to be conferred on a committee of one of the two Houses.

The resolution adopted as a sequence of this preamble contains no hint of any intention of final action by Congress on the subject. In all the argument of the case no suggestion has been made of what the House of Representatives or the Con-

gress could have done in the way of remedying the wrong or securing the creditors of Jay Cooke & Co., or even the United States. Was it to be simply a fruitless investigation into the personal affairs of individuals? If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country. By " fruitless " we mean that it could result in no valid legislation on the subject to which the inquiry referred.

What was this committee charged to do?

To inquire into the nature and history of the real-estate pool. How indefinite! What was the real-estate pool? Is it charged with any crime or offence? If so, the courts alone can punish the members of it. Is it charged with a fraud against the government? Here, again, the courts, and they alone, can afford a remedy. Was it a corporation whose powers Congress could repeal? There is no suggestion of the kind. The word "pool," in the sense here used, is of modern date, and may not be well understood, but in this case it can mean no more than that certain individuals are engaged in dealing in real estate as a commodity of traffic; and the *gravamen* of the whole proceeding is that a debtor of the United States may be found to have an interest in the pool. Can the rights of the pool, or of its members, and the rights of the debtor, and of the creditor of the debtor, be determined by the report of a committee or by an act of Congress? If they cannot, what authority has the House to enter upon this investigation into the private affairs of individuals who hold no office under the government.

The Court of Exchequer of England was originally organized solely to entertain suits of the king against the debtors of the crown. But after a while, when the other courts of Westminster Hall became overcrowded with business, and it became desirable to open the Court of Exchequer to the general administration of justice, a party was allowed to bring any common-law action in that court, on an allegation that the plaintiff was debtor to the king, and the recovery in the action would enable him to respond to the king's debt. After a while the court refused to allow this allegation to be controverted, and so, by this fiction, the court came from a very limited to be one

of general jurisdiction. Such an enlargement of jurisdiction would not now be tolerated in England, and it is hoped not in this country of written constitutions and laws; but it looks very like it when, upon the allegation that the United States is a creditor of a man who has an interest in some other man's business, the affairs of the latter can be subjected to the unlimited scrutiny or investigation of a congressional committee.

We are of opinion, for these reasons, that the resolution of the House of Representatives authorizing the investigation was in excess of the power conferred on that body by the Constitution; that the committee, therefore, had no lawful authority to require Kilbourn to testify as a witness beyond what he voluntarily chose to tell; that the orders and resolutions of the House, and the warrant of the speaker, under which Kilbourn was imprisoned, are, in like manner, void for want of jurisdiction in that body, and that his imprisonment was without any lawful authority.

At this point of the inquiry we are met by *Anderson* v. *Dunn* (6 Wheat. 204), which in many respects is analogous to the case now under consideration. Anderson sued Dunn for false imprisonment, and Dunn justified under a warrant of the House of Representatives directed to him as sergeant-at-arms of that body. The warrant recited that Anderson had been found by the House "guilty of a breach of the privileges of the House, and of a high contempt of the dignity and authority of the same." The warrant directed the sergeant-at-arms to bring him before the House, when, by its order, he was reprimanded by the speaker. Neither the warrant nor the plea described or gave any clew to the nature of the act which was held by the House to be a contempt. Nor can it be clearly ascertained from the report of the case what it was, though a slight inference may be derived from something in one of the arguments of counsel, that it was an attempt to bribe a member.

But, however that may be, the defence of the sergeant-at-arms rested on the broad ground that the House, having found the plaintiff guilty of a contempt, and the speaker, under the order of the House, having issued a warrant for his arrest, that

alone was sufficient authority for the defendant to take him into custody, and this court held the plea good.

It may be said that since the order of the House, and the warrant of the speaker, and the plea of the sergeant-at-arms, do not disclose the ground on which the plaintiff was held guilty of a contempt, but state the finding of the House in general terms as a judgment of guilty, and as the court placed its decision on the ground that such a judgment was conclusive in the action against the officer who executed the warrant, it is no precedent for a case where the plea establishes, as we have shown it does in this case by its recital of the facts, that the House has exceeded its authority.

This is, in fact, a substantial difference. But the court in its reasoning goes beyond this, and though the grounds of the decision are not very clearly stated, we take them to be: that there is in some cases a power in each House of Congress to punish for contempt; that this power is analogous to that exercised by courts of justice, and that it being the well-established doctrine that when it appears that a prisoner is held under the order of a court of general jurisdiction for a contempt of its authority, no other court will discharge the prisoner or make further inquiry into the cause of his commitment. That this is the general rule, though somewhat modified since that case was decided, as regards the relations of one court to another, must be conceded.

But we do not concede that the Houses of Congress possess this general power of punishing for contempt. The cases in which they can do this are very limited, as we have already attempted to show. If they are proceeding in a matter beyond their legitimate cognizance, we are of opinion that this can be shown, and we cannot give our assent to the principle that, by the mere act of asserting a person to be guilty of a contempt, they thereby establish their right to fine and imprison him, beyond the power of any court or any other tribunal whatever to inquire into the grounds on which the order was made. This necessarily grows out of the nature of an authority which can only exist in a limited class of cases, or under special circumstances; otherwise the limitation is unavailing and the power omnipotent. The tendency of modern decisions every-

where is to the doctrine that the jurisdiction of a court or other tribunal to render a judgment affecting individual rights, is always open to inquiry, when the judgment is relied on in any other proceeding. See *Williamson* v. *Berry*, 8 How. 495; *Thompson* v. *Whitman*, 18 Wall. 457; *Knowles* v. *The Gas-Light & Coke Co.*, 19 id. 58; *Pennoyer* v. *Neff*, 95 U. S. 714.

The case of *Anderson* v. *Dunn* was decided before the case of *Stockdale* v. *Hansard*, and the more recent cases in the Privy Council to which we have referred. It was decided as a case of the first impress'on in this court, and undoubtedly under pressure of the strong rulings of the English courts in favor of the privileges of the two Houses of Parliament. Such is not the doctrine, however, of the English courts to-day. In the case of *Stockdale* v. *Hansard* (9 Ad. & E. 1), Mr. Justice Coleridge says: "The House is not a court of law at all in the sense in which that term can alone be properly applied here. Neither originally nor by appeal can it decide a matter in litigation between two parties; it has no means of doing so; it claims no such power; powers of inquiry and of accusation it has, but it decides nothing judicially, except where it is itself a party, in the case of contempts. . . . Considered merely as resolutions or acts, I have yet to learn that this court is to be restrained by the dignity or the power of any body, however exalted, from fearlessly, though respectfully, examining their reasonableness and justice, where the rights of third persons, in litigation before us, depend upon their validity." Again, he says: "Let me suppose, by way of illustration, an extreme case; the House of Commons resolves that any one wearing a dress of a particular manufacture is guilty of a breach of privilege, and orders the arrest of such persons by the constable of the parish. An arrest is made and action brought, to which the order of the House is pleaded as a justification. . . . In such a case as the one supposed, the plaintiff's counsel would insist on the distinction between power and privilege; and no lawyer can seriously doubt that it exists: but the argument confounds them, and forbids us to enquire, in any particular case, whether it ranges under the one or the other. I can find no principle which sanctions this."

The case of *Kielley* v. *Carson and Others* (4 Moo. P. C. 63), from which we have before quoted so largely, held that

the order of the assembly, finding the plaintiff. guilty of a contempt, was no defence to the action for imprisonment. And it is to be observed that the case of *Anderson* v. *Dunn* was cited there in argument.

But we have found no better expression of the true principle on this subject than in the following language of Mr. Justice Hoar, in the Supreme Court of Massachusetts, in the case of *Burnham* v. *Morrissey*, 14 Gray, 226. That was a case in which the plaintiff was imprisoned under an order of the House of Representatives of the Massachusetts legislature for refusing to answer certain questions as a witness and to produce certain books and papers. The opinion, or statement rather, was concurred in by all the court, including the venerable Mr. Chief Justice Shaw.

"The house of representatives is not the final judge of its own power and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by this court. That house is not the legislature, but only a part of it, and is therefore subject in its action to the laws, in common with all other bodies, officers, and tribunals within the Commonwealth. Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void. The house of representatives has the power under the Constitution to imprison for contempt; but the power is limited to cases expressly provided for by the Constitution, or to cases where the power is necessarily implied from those constitutional functions and duties, to the proper performance of which it is essential."

In this statement of the law, and in the principles there laid down, we fully concur.

We must, therefore, hold, notwithstanding what is said in

the case of *Anderson* v. *Dunn,* that the resolution of the House of Representatives finding Kilbourn guilty of contempt, and the warrant of its speaker for his commitment to prison, are not conclusive in this case, and in fact are no justification, because, as the whole plea shows, the House was without authority in the matter.

It remains to consider the matter special to the other defendants set out in their plea, which claims the protection due to their character as members of the House of Representatives. In support of this defence they allege that they did not in any manner assist in the arrest of Kilbourn or his imprisonment, nor did they order or direct the same, except by their votes and by their participation as members in the introduction of, and assent to, the official acts and proceedings of the House, which they did and performed as members of the House, in the due discharge of their duties, and not otherwise.

As these defendants did not make the actual assault on the plaintiff, nor personally assist in arresting or confining him, they can only be held liable on the charge made against them as persons who had ordered or directed in the matter, so as to become responsible for the acts which they directed.

The general doctrine that the person who procures the arrest of another by judicial process, by instituting and conducting the proceedings, is liable to an action for false imprisonment, where he acts without probable cause, is not to be controverted. Nor can it be denied that he who assumes the authority to order the imprisonment of another is responsible for the acts of the person to whom such order is given, when the arrest is without justification. The plea of these defendants shows that it was they who initiated the proceedings under which the plaintiff was arrested. It was they who reported to the House his refusal to answer the questions which they had put to him, and to produce the books and papers which they had demanded of him. They expressed the opinion in that report that plaintiff was guilty of a contempt of the authority of the House in so acting. It is a fair inference from this plea that they were the active parties in setting on foot the proceeding by which he was adjudged guilty of a contempt, and in procuring the passage of that resolution.

If they had done this in any ordinary tribunal, without probable cause, they would have been liable for the action which they had thus promoted.

The House of Representatives is not an ordinary tribunal. The defendants set up the protection of the Constitution, under which they do business as part of the Congress of the United States. That Constitution declares that the senators and representatives " shall in all cases, except treason, felony, and breach of the peace, be privileged from arrest during their attendance at the session of their respective Houses, and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place."

Is what the defendants did in the matter in hand covered by this provision? Is a resolution offered by a member, a speech or debate, within the meaning of the clause? Does its protection extend to the report which they made to the House of Kilbourn's delinquency? To the expression of opinion that he was in contempt of the authority of the House? To their vote in favor of the resolution under which he was imprisoned? If these questions be answered in the affirmative, they cannot be brought in question for their action in a court of justice or in any other place. And yet if a report, or a resolution, or a vote is not a speech or debate, of what value is the constitutional protection?

We may, perhaps, find some aid in ascertaining the meaning of this provision, if we can find out its source, and fortunately in this there is no difficulty. For while the framers of the Constitution did not adopt the *lex et consuetudo* of the English Parliament as a whole, they did incorporate such parts of it, and with it such privileges of Parliament, as they thought proper to be applied to the two Houses of Congress  Some of these we have already referred to, as the right to make rules of procedure, to determine the election and qualification of its members, to preserve order, &c.  In the sentence we have just cited another part of the privileges of Parliament are made privileges of Congress. The freedom from arrest and freedom of speech in the two Houses of Parliament were long subjects of contest between the Tudor and Stuart kings and the House

of Commons. When, however, the revolution of 1688 expelled the last of the Stuarts and introduced a new dynasty, many of these questions were settled by a bill of rights, formally declared by the Parliament and assented to by the crown. 1 W. & M., st. 2, c. 2. One of these declarations is "that the freedom of speech, and debates, and proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament."

In *Stockdale* v. *Hansard*, Lord Denman, speaking on this subject, says : " The privilege of having their debates unquestioned, though denied when the members began to speak their minds freely in the time of Queen Elizabeth, and punished in its exercise both by that princess and her two successors, was soon clearly perceived to be indispensable and universally acknowledged. By consequence, whatever is done within the walls of either assembly must pass without question in any other place. For speeches made in Parliament by a member to the prejudice of any other person, or hazardous to the public peace, that member enjoys complete impunity. For every paper signed by the speaker by order of the House, though to the last degree calumnious, or even if it brought personal suffering upon individuals, the speaker cannot be arraigned in a court of justice. But if the calumnious or inflammatory speeches should be reported and published, the law will attach responsibility on the publisher. So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer."

Taking this to be a sound statement of the legal effect of the Bill of Rights and of the parliamentary law of England, it may be reasonably inferred that the framers of the Constitution meant the same thing by the use of language borrowed from that source.

Many of the colonies, which afterwards became States in our Union, had similar provisions in their charters or in bills of rights, which were part of their fundamental laws; and the general idea in all of them, however expressed, must have been the same, and must have been in the minds of the members of

the constitutional convention.  In the Constitution of the State of Massachusetts of 1780, adopted during the war of the Revolution, the twenty-first article of the Bill of Rights embodies the principle in the following language: "The freedom of deliberation, speech, and debate in either House of the legislature is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action, or complaint, in any other court or place whatsoever."

This article received a construction as early as 1808, in the Supreme Court of that State, in the case of *Coffin* v. *Coffin* (4 Mass. 1), in which Mr. Chief Justice Parsons delivered the opinion.  The case was an action for slander, the offensive language being used in a conversation in the House of Representatives of the Massachusetts legislature.  The words were not delivered in the course of a regular address or speech, though on the floor of the House while in session, but were used in a conversation between three of the members, when neither of them was addressing the chair.  It had relation, however, to a matter which had a few moments before been under discussion.  In speaking of this article of the Bill of Rights, the protection of which had been invoked in the plea, the Chief Justice said: "These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal.  I, therefore, think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered.  I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate, but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature and in the execution of the office.  And I would define the article as securing to every member exemption from prosecution for everything said or done by him as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular, according to the rules of the House, or irregular and against their rules.  I do not confine the member to his place in the House; and I am satisfied that there are cases in which

he is entitled to this privilege when not within the walls of the representatives' chamber."

The report states that the other judges, namely, Sedgwick, Sewall, Thatcher, and Parker, concurred in the opinion.

This is, perhaps, the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies, and being so early after the formation of the Constitution of the United States, is of much weight. We have been unable to find any decision of a Federal court on this clause of section 6 of article 1, though the previous clause concerning exemption from arrest has been often construed.

Mr. Justice Story (sect. 866 of his Commentaries on the Constitution) says : " The next great and vital privilege is the freedom of speech and debate, without which all other privileges would be comparatively unimportant or ineffectual. This privilege also is derived from the practice of the British Parliament, and was in full exercise in our colonial legislation, and now belongs to the legislation of every State in the Union as matter of constitutional right."

It seems to us that the views expressed in the authorities we have cited are sound and are applicable to this case. It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it.

It is not necessary to decide here that there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible. If we could suppose the members of these bodies so far to forget their high functions and the noble instrument under which they act as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French Assem-

bly in assuming the function of a court for capital punishment, we are not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate. In this, as in other matters which have been pressed on our attention, we prefer to decide only what is necessary to the case in hand, and we think the plea set up by those of the defendants who were members of the House is a good defence, and the judgment of the court overruling the demurrer to it and giving judgment for those defendants will be affirmed. As to Thompson, the judgment will be reversed and the case remanded for further proceedings.

*So ordered.*