## POWER OF THE GENERAL ASSEMBLY TO INVESTIGATE LOCAL GOVERNMENTS.

Circuit Court of Hamilton County.

THE STATE OF OHIO, ON THE RELATION OF HIRAM M. RULISON, PROSECUTING ATTORNEY OF HAMILTON COUNTY, OHIO, v. BENJAMIN F. GAYMAN ET AL.

Decided, July 27, 1908.

*Constitutional Law—Investigation of Corruption in Local Governments—Power of the General Assembly to Order—Justification for —Procuring Information for a Future General Assembly not Sufficient—Real Purpose of the Resolution, not Its Declared Purpose, Will be Sought—Revolutionary Procedure not Permissible.*

1. The Senate joint resolution passed by the General Assembly February 14, 1908, providing for the appointment of a committee to investigate charges of corruption in the government of the city of Cincinnati and county of Hamilton, is an exercise of judicial power not expressly conferred by the Constitution, and a gross violation of Section 32 of Article II thereof, unless it can be justified on the ground of seeking information in aid of intended legislation.

2. But the intemperate language in the resolution and the license and revolutionary procedure proposed, together with the declaration that all laws are being violated by an organized band which no one dares to oppose, make it clear that hope is not based on additional legislation which obviously could not be rendered effective under such circumstances; but these considerations cause it to be evident that the resolution was not adopted in good faith for the purpose of providing remedial laws, and places it beyond the pale of the Constitution.

3. And were this not true, the fact that the General Assembly has adjourned *sine die* renders it impossible that information which might be obtained by such an investigation shall be used by the body seeking it for the purpose proposed, or that it will be so used by a body over which the recent General Assembly will have any control, and therefore deprive the investigation of the purpose announced, and leaves the matter in the same situation as though no purpose had been declared by the resolution.

*Hiram M. Rulison* and *Frank F. Dinsmore,* for plaintiff.
*Theodore Horstman,* contra.

GIFFEN, J.; SWING, P. J., and SMITH, J., concur.

The pleadings in this case raise the question of the validity of a joint resolution of the General Assembly and of the power of the committee appointed thereunder to investigate charges of corruption existing in the government of the city of Cincinnati and the county of Hamilton.

The preamble recites the appointment of a former committee for the same purpose, which disclosed many abuses subversive of government by the people, one of which was corrected by a subsequent act of the Legislature; charges in general terms of usurpation of power belonging to the people, bribery, corruption in office, wholesale election frauds and other forms of misgovernment. The resolution provides for the appointment of a committee of six, three from each house, with full power to investigate all said matters and charges and all matters and things in any way pertaining thereto; empowers the committee to compel the production before it of any books and records, letters or documentary evidence of any character, which, in the judgment of the committee or a majority thereof, pertains to any matter or thing under investigation and wherever found, and also to compel the attendance of any witnesses; and directs the committee to make report to the General Assembly if in session, and if not to the Governor for transmission to the succeeding General Assembly, of its proceedings with full transcript of testimony taken by it together with its findings in writing with such recommendations for further legislation and amendment to existing legislation as the disclosures of said committee may warrant.

The distrust of our institutions, laws and men expressed by the Legislature in this resolution is unbounded and deplorable, extending even to its own ability to provide a remedy, as it imposes the burden upon its successors. The very nature of the power granted as well as the persistence in asserting it after the decision of the case of State v. Guilbert, 75 O. S., 1, calls for a determination of the question whether the right to exercise it exists at any time independent of the adjournment of the Legislature.

The claim is made first that the power conferred is judicial

and not legislative, the exercise of which would contravene Section 32, Article II of the Constitution, providing, ''The General Assembly shall grant no divorce, nor exercise any judicial power not herein expressly conferred.''

The power to subpoena witnesses, to send for books and papers, to hear and determine charges of crime, is certainly judicial in its nature; but whether so in the sense of this constitutional inhibition is not as clear. If the right to punish were added the power would be complete and embrace every act that could be done by the courts; but the very absence of this power shows how barren of good results such proceedings would be, and on the other hand no one can measure the harm that would follow.

The General Assembly had, prior to the adoption of the present Constitution, not only assumed power not delegated to them, but had usurped a power expressly conferred upon the judiciary, by granting divorces.  *Bingham* v. *Miller,* 17 Ohio, 447.

This abuse of power, existing for a period of more than forty years, was the occasion of emphasizing the inhibition against granting divorces, and in no sense lessens the force of or in any way qualifies the general provision against the exercise of judicial power not expressly conferred.

The special as well as the general inhibition existed by implication from the distribution of the powers of the state, by the Constitution, to the three departments of government *(The City of Zanesville* v. *Telegraph & Telephone Co.,* 64 O. S., 67), but owing to the growing temptations to exercise power not conferred it was deemed wise to deny the right in positive terms. The resolution empowers the committee in effect to frame indictments, hear ex parte evidence, and determine the guilt or innocence of the accused, who would thereby be exposed to all the censur and disgrace attending a legal trial without the privilege of making a defense, and without exempting them from subsequent trial for the same offense.  It was intended to avoid such confusion of power and protect the personal and property rights of the citizen by adopting this provision of the Constitution, and unless this investigation can be justified upon the

ground of seeking information in aid of intended legislation it is a gross violation of such provision. *Kilbourn* v. *Thompson*, 103 U. S., 168.

This brings us to an inquiry of the purpose the Legislature had in granting such extraordinary power to a special committee—not the expressed but the real purpose. The resolution declares the purpose to be "for further legislation and amendment to existing legislation as the disclosures of said committee may warrant"; but the constitutional rights of citizens of this state can not be invaded by either branch of the government upon a mere declaration of good faith. A present intention to do an act in the future, when brought in question can only be determined by existing conditions. In this case the conditions relied on are expressed in the preamble to the resolution and are little short of anarchy itself. There is no suggestion of any defect in the criminal statutes thus violated, either in definition or penalty; but the chief complaint is that an organized band of law breakers are defying all laws and no one dare restrain them.

What legislation is proposed to meet a situation like this if found to exist? None whatever, and none could under such conditions be suggested that would be more effective than the present statutes. The efficiency of all law and especially criminal law lies in the certainty of its enforcement, and it would be a fruitless task to pass numerous criminal statutes when existing statutes upon the same subjects with ample penalties are violated with impunity. We might with propriety suggest the mode of procedure under the Constitution and the statutes, were it not that the resolution as a whole forecloses every avenue of escape from the dire calamity by declaring all the instruments for the enforcement of law to be tainted with corruption. Such charges might not be unexpected from irresponsible agitators in the heat and excitement of a political campaign, but so far as we are advised have no precedent in any adjudged case or even in any legislative body.

The language of the preamble is intemperate, illtimed and revolutionary. If sanctioned by the courts the dominant political

party will be licensed to prefer, at each recurring election, charges of crime against the citizens of any community of which its adversary has control and to hear and determine the same.

We are persuaded that however gross may be the abuse of power, and however flagrant may be the violation of law, the people are not ready nor willing to abandon orderly and legal procedure in the exposure, conviction and punishment of crime; and that even the authors of this injustice will, when released from political strife and turmoil, condemn their own production. We are of opinion therefore that the resolution itself shows that it was not, in good faith, passed for the purpose of remedial legislation, and that an attempt was made to exercise judicial power contrary to the Constitution.

If we are wrong in this conclusion the question still arises whether the committee can act after the final adjournment of the General Assembly. The right to investigate and gather information in the manner here proposed exists, if at all, as an incident of and by implication from the power to legislate conferred by the Constitution. An act duly passed by the General Assembly is a complete exercise of the power to legislate; but a resolution to investigate for the purpose of further legislation, passed by the same body, is the exercise of a right incident to that power, and if the power itself be surrendered the incidental right goes with it.

When the General Assembly adjourned *sine die* its purpose to use the information in aid of legislation could no longer be carried out; and while it could order the information to be transmitted to its successor, it could not form or express a purpose for nor impose its own upon its successor. The latter would use the information as it saw fit, without regard to the intention of the former.

It is the same as if no purpose were expressed, and the result is that an investigation is proposed, without any legislative purpose or any other acknowledged purpose, with authority in the committee to roam over the entire field of governmental functions and report its discoveries to the next General Assembly fresh from the people who alone have power to instruct.

Such power to investigate is not conferred by the Constitution in express terms nor by implication. *Cushing's L. & P. of Leg. Assemblies*, Section 496; *In re Pac. Ry. Co.*, 32 Fed., 241.

Demurrer to answers sustained.

---

## EVIDENCE ESTABLISHING A GIFT CAUSA MORTIS.

Circuit Court of Hamilton County.

GALBRAITH V. SUTTON ET AL. [*]

Decided, June 15, 1908.

*Gift of Bonds in Expectation of Death—Necessary Conditions to Render Legal—Evidence Establishing Validity of Gift.*

Bonds given by an invalid to her sister in expectation of death, but with the condition that they be returned to her in case she should need them, are a valid gift *causa mortis.*

*David Davis* and *John Q. Martin*, for plaintiff in error.

*G. S. Hawke*, contra.

SMITH, J.; SWING, P. J., and GIFFEN, J., concur.

A gift *causa mortis* is a gift of personal property made in the immediate apprehension of death subject to the conditions, express or implied, that if the donor should not die as expected, or if the donee should die first, or if the donor should revoke the gift before death, the gift shall be void. Am. & Eng. Enc., Vol. 14, page 1052.

We think the evidence in this case shows that the gift to defendant in error as claimed by her was a gift *causa mortis* from Elizabeth L. Galbraith, and particularly when the donor used this language: "Oh, Mary, I am sick; I am very sick. I do not think I am going to live very long; I am going to make you a present; I am going to give you some of my bonds," and afterwards when the donor said: "Mary, I am going to give you some of my bonds. I talked to you about it last fall. I did not do it. I will

---

[*] Affirming *Sutton, Executrix*, v. *Galbraith*, 7 N. P.—N. S., 293.